**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION - COLUMBUS**

| | | |
|---|---|---|
| MARIAN POEPPELMEYER<br>3030 Spruceview Ct.<br>Columbus, OH 43231<br><br>Plaintiff,<br><br>vs.<br><br>VITAS HEALTHCARE CORPORATION OF OHIO<br>655 Metro Place South, Suite 770<br>Dublin, OH 43017<br><br>Also serve statutory agent:<br><br>CSC-LAWYERS INCORPORATING SERVICE (CORPORATION SERVICE COMPANY)<br>50 W. Broad St., Suite 1800<br>Columbus, OH 43215<br><br>And<br><br>VITAS HEALTHCARE CORPORATION<br>100 South Biscayne Blvd., Suite 1500<br>Miami, FL 33131<br><br>And<br><br>CRYSTAL FLEMING<br>c/o Vitas Healthcare Corporation Of Ohio<br>655 Metro Place South, Suite 770<br>Dublin, OH 43017<br><br>Defendants. | : | Case No.: 2:13-cv-1245<br>JUDGE:<br>MAGISTRATE:<br><br>**COMPLAINT**<br>**with Jury Demanded on All Issues So Triable** |

# COMPLAINT

Plaintiff Marian Poeppelmeyer (referred to herein as "Plaintiff" or "Mrs. Poeppelmeyer"), for her complaint against Defendants Vitas Healthcare Corporation Of Ohio, Vitas Healthcare Corporation, and Crystal Fleming (referred to collectively herein as "Defendants"), hereby states as follows:

## I. PARTIES AND VENUE

1. This action is brought pursuant to the Family and Medical Leave Act of 1993 ("FMLA"), the Ohio Laws Against Discrimination, O.R.C. Chapter 4112 ("Chapter 4112"), and 28 U.S.C. §1331 and §1343(a)(4). This Court's jurisdiction in this matter is also predicated upon 28 U.S.C. §1367 as this Complaint raises additional claims pursuant to the law of Ohio, over which this Court maintains supplemental subject matter jurisdiction.

2. Venue is proper in this forum pursuant to 28 U.S.C. §1391(b)(1) because at least one of the Defendant Corporations' primary place of business is located within the Southern District of Ohio. Additionally, venue is proper in this forum pursuant to 28 U.S.C. §1391(b)(2) because Plaintiff entered into an employment relationship with Defendant in the Southern District of Ohio and performed her job duties within the Southern District. This Complaint is being timely filed within 90 days of Plaintiff's receipt of Notices of Right to Sue from the U.S. Equal Employment Opportunity Commission. (Notices of Right to Sue, attached hereto as Exhibit A).

3. At all times material herein, Mrs. Poeppelmeyer resided in the Southern District of Ohio and was a resident of Franklin County, Ohio.

4. Upon information and belief, Defendant Crystal Fleming resided in the Southern District of Ohio and was a resident of Franklin County, Ohio.

5. Plaintiff is an "employee" as defined by the FMLA and Chapter 4112 of the Ohio Revised Code.

6. Vitas Healthcare Corporation of Ohio and Vitas Healthcare Corporation (collectively referred to herein as "VITAS") are both an "employer" as that term is defined by the FMLA and Chapter 4112 of the Ohio Revised Code.

7. VITAS was Mrs. Poeppelmeyer's employer at all times material herein, and has employed more than fifty (50) people at all relevant times herein.

## II. FACTS

8. Mrs. Poeppelmeyer's employment with VITAS began in February 2011 and continued until she was terminated on July 26, 2012.

9. Mrs. Poeppelmeyer began working for VITAS in the positions of Community Liaison and Volunteer Manager.

10. During her employment, Mrs. Poeppelmeyer's direct supervisor was Crystal Fleming, VITAS's Director of Market Development.

11. Mrs. Poeppelmeyer was qualified for the position of Community Liaison and Volunteer Manager.

12. Mrs. Poeppelmeyer was approached and courted by VITAS Director of Market Development Crystal Fleming to accept the Community Liaison position at VITAS. Mrs. Poeppelmeyer was purposely sought out for her church connections, strong networking abilities in Central Ohio, Somali immigrant experience, experience with the underserved and least privileged in society (homeless, poor, African American community, etc.).

13. During their initial meeting, Mrs. Poeppelmeyer asked multiple questions regarding the working conditions of the VITAS job. Mrs. Poeppelmeyer asked about quotas for sales – Ms.

Fleming said there were no sales quotas. Mrs. Poeppelmeyer asked about time tracking - Ms. Fleming said there was no clocking in or clocking out. Ms. Fleming assured Mrs. Poeppelmeyer that there was no mirco-managing and that Mrs. Poeppelmeyer could come and go as she pleased.

14. During this meeting, Ms. Fleming further enticed Mrs. Poeppelmeyer by telling her that she could develop these two positions and programs as Mrs. Poeppelmeyer determined, in essence asking Mrs. Poeppelmeyer to make them her own.

15. Ms. Fleming told Ms. Poeppelmeyer that as both programs grew, VITAS would be able to hire additional staff and Ms. Poeppelmeyer could select which one of the two position she preferred to continue working exclusively.

16. Ms. Fleming additionally enticed Mrs. Poeppelmeyer by offering an increased salary and providing a laptop computer.

17. At the time that Mrs. Poeppelmeyer was being pursued by VITAS and Ms. Fleming, she was employed by Heartland Healthcare as the Volunteer Coordinator over 10 counties, a position which she had held for 4 years. .

18. As Volunteer Coordinator for Heartland, Mrs. Poeppelmeyer had extensive freedom and control over her position: she could come and go as she pleased, she did not clock in or clock out, she had total freedom to schedule her time to develop her volunteer program as she desired within required policies, and she had accrued over 3 weeks annual vacation days plus holiday pay.

19. By February 22, 2011, based upon the statements made by Ms. Fleming regarding VITAS working environment and responsibilities, Mrs. Poeppelmeyer accepted the Community Liaison/Volunteer Manager position with VITAS.

20. Only later, after she had accepted the position, would Mrs. Poeppelmeyer learn that the VITAS position did have sales quotas, did have daily call/appointment quotas, did have time tracking, and she could not "come and go" as she pleased.

21. On December 19, 2011, Mrs. Poeppelmeyer's son, Austin (21), was officially given the diagnosis of testicular cancer. This was confirmed by the Zangmeister Center on Dec. 30, 2011. Throughout his cancer treatment, Mrs. Poeppelmeyer was actively involved in his medical condition, medical care, treatment plan, and logistical needs.

22. At her first opportunity, on or about the first week of January 2012, Mrs. Poeppelmeyer disclosed this information about her son's medical condition to VITAS management including VITAS' General Manager Steven Wishart and Crystal Fleming.

23. No one at VITAS actively suggested to Mrs. Poeppelmeyer that she investigate or pursue family medical leave as an option for caring for her son.

24. Based upon the cancer clinic's recommendations that Mrs. Poeppelmeyer complete an FMLA form for herself, Mrs. Poeppelmeyer had a discussion with VITAS HR/Office Manager Michelle Casey regarding applying for and taking FMLA leave to care for her son.

25. Ms. Casey told Ms. Poeppelmeyer that "FMLA was not appropriate for her situation." Relying on this information, Mrs. Poeppelmeyer did not go further into the application for FMLA.

26. Mrs. Poeppelmeyer was not provided any rationale, written or otherwise, for the denial of her mere request for information regarding FMLA benefits.

27. After Mrs. Poeppelmeyer informed VITAS that her son was suffering from cancer, the working condition within VITAS began to steadily deteriorate to the point where Mrs. Poeppelmeyer's clients were being systematically targeted.

28. Mrs. Poeppelmeyer experienced continued hostile, belittling, and demeaning treatment while employed with VITAS, including but not limited to:

a. Mrs. Poeppelmeyer was repeatedly embarrassed and belittled in front of other VITAS staff during morning "stand-up" or IDT meetings. No other employees were belittled in front of other staff. Mrs. Poeppelmeyer's hostile treatment was witnessed by other employees, including Lori Euans, MSW who previously worked for VITAS. See *Affidavit of Lori Euans*, attached hereto as Exhibit B, ¶¶5-6.

b. On or about March 30, 2012, Mrs. Poeppelmeyer was physically cornered in a marketing supply closet by Ms. Fleming and berated regarding her volunteer responsibilities;

c. General Manager Steven Wishart questioned Mrs. Poeppelmeyer's dedication when he declared in front of other employees that Mrs. Poeppelmeyer did not care about patients or volunteers;

d. Ms. Fleming directly told Mrs. Poeppelmeyer on numerous occasions that she did not care about the Volunteer Manager position, however Mrs. Poeppelmeyer was still fulfilling the position and required to complete all the assigned tasks;

e. Ms. Fleming regularly threatened Mrs. Poeppelmeyer with comments such as "Do you want me to fire you?" or "Do you want me to call HR?";

29. These hostile actions caused Mrs. Poeppelmeyer to suffer severe emotional distress.

30. During the time that these hostile actions were taking place, Mrs. Poeppelmeyer took multiple actions to deal with these situations at VITAS. Mrs. Poeppelmeyer sought medical

care for the additional stress and anxiety these situations were creating in her life. Mrs. Poeppelmeyer's doctor acknowledged her condition and increased her medications. Additionally, Ms. Poeppelmeyer began to seek chiropractic treatment resulting from added stress and strain. She further sought pastoral counseling with her local pastor.

31. On March 30, 2012, Mrs. Poeppelmeyer was physically cornered in a marketing supply closet by Ms. Fleming. Ms. Fleming refused to allow Mrs. Poeppelmeyer to leave the room by physically blocking the door. While blocking the exit, Ms. Fleming was belittling, condescending, and escalated a work-place discussion into personal attacks against Mrs. Poeppelmeyer's character and integrity.

32. This incident was the final step before Mrs. Poeppelmeyer recognized she need to involved the VITAS Human Resources Department. In early April 2012, Mrs. Poeppelmeyer placed phone calls to Susan Philips and Jacylen Drew in the VITAS HR department.

33. Mrs. Poeppelmeyer alerted these individuals to the horrendous treatment she was receiving at the hands of Ms. Fleming and Mr. Wishart on no less than 6 separate occasions, many in writing and sent to HR via email and others via telephone calls to HR. These emails outline the circumstances of Mrs. Poeppelmeyer's hostile treatment and requested, if not pleaded, for assistance.

34. Despite her repeated requests for help, Mrs. Poeppelmeyer saw no results and the hostile treatment only escalated.

35. It was in the spring of 2012, after she had started discussing her harassment claims with HR, that Mrs. Poeppelmeyer began to notice that VITAS management was retaliating against her by specifically targeting the clients and customers which she had personally generated.

36. Each one of the examples below reflects an instance of how VITAS management and Ms. Fleming specifically, attempted to intentionally target Mrs. Poeppelmeyer's potential/existing clients:

37. Amerivets. Ms. Fleming unexpectedly joined Mrs. Poeppelmeyer for a client meeting with Amerivets contact, Eric Traylor. Mr. Traylor's testimony, Ms. Fleming "took over the meeting," was "aggressive and hostile towards Marian," and "belittled Marian multiple times." *Affidavit of Eric Traylor,* at ¶¶6,8, attached hereto as Exhibit C. Mr. Traylor found Ms. Fleming's behavior "rude and demeaning towards Marian" and "extremely unprofessional." *Traylor Aff.,* ¶8. In fact, Mr. Traylor believes that Ms. Fleming was "trying to purposefully embarrass Marian," so much so that he got the impression that Ms. Fleming was "preparing to terminate Marian, or attempting to get Marian to resign her position from VITAS." *Traylor Aff.,* ¶8-9. Mr. Traylor's experience with Ms. Fleming was so negative, that he wrote a letter to VITAS corporate and has never referred another client to VITAS. *Traylor Aff.,* ¶11-13.

38. Schoedinger's Funeral Home. Another example where Ms. Fleming took control over the meeting and pursued with argumentative and confrontational speech conversation, trying to push Schoedinger's to make VITAS their only and first hospice to refer their pre-funeral clients. Schoedinger's representative made multiple attempts to answer her, but Ms. Fleming refused to listen. Ms. Fleming insulted Schoedingers by saying it was the most expensive and drilled their representative on what funeral home was the least expensive, which caused the representative to become visibly upset. This negatively impacted Mrs. Poeppelmeyer's efforts to collaborate with the Schoedinger's Community Liaison in joint senior forums in the community. After this incident, Schoedingers' community liaison refused to work directly with or deal with Crystal

Fleming again. Upon information and belief, Schoedingers never referred another client to VITAS during Mrs. Poeppelmeyer's employment.

39. Cancer Support Community of Central Ohio (CSCCO). After Mrs. Poeppelmeyer had previously laid all the groundwork for multiple educational forums to caregivers, pastors, SWers, RNs, chaplains, and family members and general public, she learned that Ms. Fleming had previously damaged the relationship with this client by refusing to make a promised donation. CSCCO was another referral source damaged by Ms. Fleming.

40. AAAWA: African American Alzheimer's and Wellness Association. During a conversation with Mrs. Poeppelmeyer, the director relayed that "I detected last fall that Crystal wasn't interested in pursuing a relationship with us because I picked up in a conversation with her that she believed that we were not referring enough people to her, nor, that she suspected we would be growing and our database would grow as it has….that is why I backed off after we first met last fall. Our database is now quite extensive and any hospice who chooses to work with us will benefit greatly from the referrals that will come….Crystal's decision made no sense if she wants to reach into the African American community…..". At this point, Mrs. Poeppelmeyer knew that this was another potential client ruined by Ms. Fleming.

41. ALS –Lou Gehrig's Disease – Association. Ms. Fleming had promised a $5,000 sponsorship for the ALS Walk. Mrs. Poeppelmeyer was the client contact and was relaying messages between Ms. Fleming and the client. For reasons unknown at the time, Ms. Fleming had multiple questions regarding the walk and required Mrs. Poeppelmeyer to contact the client four times in one day with menial questions. After all this run-around and questions to the client, Ms. Fleming informed Mrs. Poeppelmeyer that VITAS would not be making any sponsorship at any level. This severely damaged and strained Mrs. Poeppelmeyer's relationship with this client

because the client was under the impression that, after being asked multiple questions about the event from VITAS management, the $5,000 sponsorship would be coming through from VITAS.

42. Vineyard Community Center: A pastoral friend of Mrs. Poeppelmeyer's agreed to meet with her regarding VITAS. For reasons unknown, Ms. Fleming came on to the meeting. Ms. Fleming controlled the entire conversation, was far too aggressive, and came on too strong. Although Mrs. Poeppelmeyer was the person with the previous relation with this contact person, Ms. Fleming intentionally disempowered Mrs. Poeppelmeyer in front of him by controlling the meeting. Mrs. Poeppelmeyer never heard from this referral source again.

43. Senior and Baby Boomer Expo / First Light Home Care. This client enjoyed working with Mrs. Poeppelmeyer and really wanted VITAS to attend the Expo. Mrs. Poeppelmeyer even placed this on her Q3 strategic Plan submitted in June, alerting Ms. Fleming of her recommendation that VITAS have a presence at this event. Mrs. Poeppelmeyer properly turned in check request and all supporting documents by July 12, 2012, thirty days in advance of the event as is required. Mrs. Poeppelmeyer later learned that Ms. Fleming had delayed action on this request/opportunity for reasons unknown, causing Mrs. Poeppelmeyer to miss the thirty days in advance requirement for such requests.

44. Seton Square Housing Unit. Mrs. Poeppelmeyer attempted to bring in new business by facilitating a senior coffee forum. Although she had previously conducted a very successful Women's Tea function where over 40 residents attended, Mrs. Poeppelmeyer was specifically instructed by Ms. Fleming not to service this 218 apartment American and Chinese senior housing unit. Yet on the day she was terminated, Ms. Fleming came to her and asked why Mrs. Poeppelmeyer was not working on this account and why it did not appear on her time tracking system for the month of August and beyond.

45. Canal Winchester Senior Center. Even though Mrs. Poeppelmeyer properly submitted all paper work, VITAS at first refused to pay a simple $150 invoice and then delayed paying the invoice. This refusal to pay severely damaged Mrs. Poeppelmeyer's long-standing relationship with this senior center.

46. WRFD 88 AM. This faith-based organization, was one of Mrs. Poeppelmeyer's accounts/clients. Ms. Fleming again delayed payment of a $1,634 bill from the client, damaging Mrs. Poeppelmeyer's trust relationship with the client and compromising the client's trust level with VITAS for future events. The payment for this event in May 2012 was delayed weeks because of Ms. Fleming's actions even though Ms. Fleming had signed a contract agreement in November 2011 for that event.

47. Ohio Association of Senior Centers: The Director offered VITAS the ability to have a quarterly article placed for free in their newsletter that goes to all 99 senior centers in Ohio. Mrs. Poeppelmeyer properly submitted a request to Ms. Fleming, who missed the deadline and lost opportunity for Mrs. Poeppelmeyer to expand referral sources for VITAS.

48. King Arts Complex, Ohio Memorial Chapter of Tuskegee Airmen [TAI], Organization of Black Aerospace Professionals: Mrs. Poeppelmeyer was working on a large event scheduled for Sept. 22, 2012 with the prestigious King Arts Complex within the African American community and two other predominant African American organizations. Mrs. Poeppelmeyer suggested that her superiors, Ms. Fleming and Mr. Wishart, meet these individuals over dinner. The dinner was taken seriously by all parties involved; VITAS's General Manager Mr. Wishart had made the commitment to pay for the dinner. However, at the last minute, VITAS management canceled the dinner and withdrew VITAS's involvement with the event. Due to this cancellation, VITAS lost a large referral base and destroyed its opportunity within the African American

community. Mrs. Poeppelmeyer's earned trust with these organizations was equally severely damaged and the VITAS management's cancellation directly impacted Mrs. Poeppelmeyer's ability to perform her job.

49. In addition to the intentional targeting of her clients, Mrs. Poeppelmeyer also had multiple client accounts taken away from her and reassigned to other VITAS employees, without explanation from management. This was often done without Mrs. Poeppelmeyer's knowledge. Reassigning her clients to other VITAS employees negatively impacted Mrs. Poeppelmeyer's work performance.

50. Mrs. Poeppelmeyer was also denied appropriate credit for new client referrals which she was generating. The credit was often given to other VITAS employees, when the credit was due to Mrs. Poeppelmeyer. The denial of appropriate credit negatively impacted Mrs. Poeppelmeyer's performance as measured by the VITAS database system.

51. Mrs. Poeppelmeyer was constantly being subjected to a set of ad-hoc "rules, regulations, and guidelines" which was vastly different than how other employees were treated, including the following examples:

a. Mrs. Poeppelmeyer was not provided access to company gifts for distribution to her clients, while other employees were provided access;

b. Mrs. Poeppelmeyer was not permitted to use client billing accounts (i.e. Sugarbush) , while other employees were permitted; See also *Euans Aff.*, at ¶9.

c. Mrs. Poeppelmeyer was not permitted to utilize VITAS Christmas gifts for her clients, so she went shopping for client gifts and was then reprimanded for taking time to go shopping;

d. Ms. Fleming was constantly changing the referrals reporting process for Mrs. Poeppelmeyer; Ms. Fleming was constantly changing how Mrs. Poeppelmeyer should record sales calls into the time-tracking system, initially permitting her to count one meeting with 5 clients as 5 sales calls, and then changing the policy in April 2012.

e. Mrs. Poeppelmeyer was never properly trained on multiple time-entry programs, yet was expected to properly utilize these programs and was disciplined when she did the entries incorrectly, moreover, the rules on how to do these continually changed;

f. Mrs. Poeppelmeyer's requests for funds for events and requests for specific designed flyers in furtherance of company goals were intentionally delayed by management;

g. Ms. Fleming would demand immediate attention to emails, text messages, and phone calls with unreasonable time constraints;

h. Mrs. Poeppelmeyer was "shoo-ed" away by Ms. Fleming in front of other staff;

i. Mrs. Poeppelmeyer was subjected to unwritten rules regarding scheduling of appointments;

j. Mrs. Poeppelmeyer was instructed to cancel all Friday appoints which she had previously scheduled and be in the office on all Fridays from 8-5pm.

52. As a result of the continued hostility in the workplace, the targeting of her clients, and the retaliation she was experiencing, Mrs. Poeppelmeyer attempted to resign her position on July 23, 2012.

53. VITAS refused to accept Mrs. Poeppelmeyer's resignation.

54. VITAS terminated Mrs. Poeppelmeyer on July 26, 2013.

## FIRST CAUSE OF ACTION

**(Promissory Estoppel – VITAS & Fleming)**

55. All of the preceding paragraphs are realleged as if fully rewritten herein.

56. VITAS has *respondeat superior* liability for the employment related actions of Ms. Fleming, including making offers of employment to potential employees.

57. Ms. Fleming, made numerous promises and representations to Mrs. Poeppelmeyer regarding the terms of her employment with VITAS. These promises included but are not limited to: no sales quotas, no clocking in or clocking out, and no mirco-managing to the extent that Mrs. Poeppelmeyer could come and go as she pleased.

58. VITAS, by and through Ms. Fleming, made numerous promises and representations to Mrs. Poeppelmeyer regarding the terms of her employment with VITAS. These promises included but are not limited to: no sales quotas, no clocking in or clocking out, and no mirco-managing to the extent that Mrs. Poeppelmeyer could come and go as she pleased.

59. During her employment, VITAS had sales quotas for Mrs. Poeppelmeyer.

60. During her employment, VITAS required Mrs. Poeppelmeyer to clock in and clock hour, keeping track of all her hours.

61. During her employment, VITAS did micro-manage Mrs. Poeppelmeyer. Ms. Fleming instructed Ms. Poeppelmeyer to modify her schedule to remain in the office on multiple occasions. Mrs. Poeppelmeyer was not permitted to come and go as she pleased.

62. Mrs. Poeppelmeyer reasonably relied upon VITAS's and Ms. Fleming's promises when, among other actions, Mrs. Poeppelmeyer quit her secure job at Heartland and accepted the new position with VITAS.

63. Defendants knew or should have known that Mrs. Poeppelmeyer would rely on the promise which directly related to the terms and conditions of her employment.

64. As a direct and proximate result of VITAS's and Ms. Fleming's conduct, Mrs. Poeppelmeyer has suffered and will continue to suffer economic and non-economic damages, including but not limited to pain and suffering and the loss of salary, benefits, and other terms, privileges, and conditions of employment for which Defendants are liable.

## SECOND CAUSE OF ACTION

### (FMLA – Interference under 29 U.S.C. §2615(a)(1))

65. All of the preceding paragraphs are realleged as if fully rewritten herein.

66. This claim is brought under federal law, specifically the Family and Medical Leave Act of 1993, 29 U.S.C. §2615(a)(1).

67. Mrs. Poeppelmeyer's son suffers from testicular cancer, a severe medical condition, as defined by the FMLA.

68. Mrs. Poeppelmeyer is entitled to leave pursuant to 29 USC 2612(a)(1)(C), so that she may "care for…a son…of the employee, if such... son... has a serious health condition."

69. Mrs. Poeppelmeyer alerted VITAS management that her son had testicular cancer.

70. Mrs. Poeppelmeyer requested information pertaining to her eligibility for FMLA from VITAS.

71. VITAS HR/Office Manager Michelle Casey told Ms. Poeppelmeyer that "FMLA was not appropriate for her situation."

72. Relying on this information, Mrs. Poeppelmeyer did not go further into the application for FMLA.

73. VITAS interfered with the exercise of Mrs. Poeppelmeyer's FMLA benefits by refusing to provide her information regarding her eligibility for FMLA benefits.

74. VITAS interfered with the exercise of Mrs. Poeppelmeyer's FMLA benefits by failing to properly explain FMLA benefits to Mrs. Poeppelmeyer.

75. VITAS interfered with the exercise of Mrs. Poeppelmeyer's FMLA benefits by discouraging her from pursuing FMLA benefits and discouraging her from filing an FMLA application.

76. VITAS interfered with the exercise of Mrs. Poeppelmeyer's FMLA benefits by not providing Mrs. Poeppelmeyer with an application for FMLA benefits.

77. As a direct and proximate result of VITAS's conduct, Mrs. Poeppelmeyer has suffered and will continue to suffer economic and non-economic damages, including but not limited to pain and suffering and the loss of salary, benefits and other terms, privileges and conditions of employment for which VITAS is liable.

78. As a result of VITAS's conduct, VITAS is liable for compensatory damages, liquidated double damages, and reasonable attorney's fees and costs.

## THIRD CAUSE OF ACTION

### (FMLA – Discrimination/Retaliation under 29 U.S.C. §2615(a)(2); 2615(b))

79. All of the preceding paragraphs are realleged as if fully rewritten herein.

80. This claim is brought under federal law, specifically the Family and Medical Leave Act of 1993, 29 U.S.C. §2615(a)(2) and 29 U.S.C. §2615(b).

81. Mrs. Poeppelmeyer's son suffers from testicular cancer, a severe medical condition, as defined by the FMLA.

82. Mrs. Poeppelmeyer is entitled to leave pursuant to 29 USC 2612(a)(1)(C), so that she may "care for…a son…of the employee, if such... son... has a serious health condition."

83. VITAS discriminated and/or retaliated against Mrs. Poeppelmeyer by subjecting her to a hostile workplace, targeting her clients in a calculated effort to discredit her work performance, and ultimately terminating her employment.

84. Mrs. Poeppelmeyer's application for FMLA intermittent leave, and her son's increases insurance costs for VITAS, were both a motivating factor in VITAS's decisions to target Mrs. Poeppelmeyer's clients in an effort to terminate her employment.

85. As a direct and proximate result of VITAS's conduct, Mrs. Poeppelmeyer has suffered and will continue to suffer economic and non-economic damages, including but not limited to pain and suffering and the loss of salary, benefits and other terms, privileges and conditions of employment for which VITAS is liable.

86. As a result of VITAS's conduct, VITAS is liable for compensatory damages, liquidated double damages, and reasonable attorney's fees and costs.

**FOURTH CAUSE OF ACTION**

**(Disability Retaliation – O.R.C. §4112.02(J))**

87. Mrs. Poeppelmeyer realleges each of the allegations contained in the preceding paragraphs of his Complaint as if fully restated herein.

88. This claim is brought under Ohio law.

89. Mrs. Poeppelmeyer engaged in a protected activity when she alerted VITAS management that her son had testicular cancer.

90. Mrs. Poeppelmeyer engaged in a protected activity by requesting an application for FMLA leave related to her care and treatment for her son's disability.

91. Mrs. Poeppelmeyer engaged in a protected activity by asking the HR department for information concerning her eligibility for FMLA leave related to her care and treatment for her son's disability.

92. Mrs. Poeppelmeyer engaged in a protected activity by voicing her concerns with her supervisors regarding the hostile and harassing treatment she was subjected to while employed with VITAS.

93. VITAS knew that Mrs. Poeppelmeyer engaged in each protected activity.

94. Once Mrs. Poeppelmeyer engaged in the aforementioned protected activities, VITAS purposefully retaliated against her refusing to provide truthful and accurate FMLA information, refusing to provide an FMLA application, refusing to correct the hostile and harassing behavior, refusing to accept Mrs. Poeppelmeyer's resignation, and ultimately by terminating her employment.

95. As a direct and proximate result of VITAS' conduct, Mrs. Poeppelmeyer has suffered and will continue to suffer economic and non-economic damages, including but not limited to pain and suffering and the loss of salary, benefits and other terms, privileges and conditions of employment for which VITAS is liable.

96. VITAS' conduct was willful, wanton, reckless and/or malicious for which VITAS is liable for compensatory damages, punitive damages and reasonable attorney's fees and costs.

**FIFTH CAUSE OF ACTION**

**(Hostile work environment)**

97. Mrs. Poeppelmeyer realleges each of the allegations contained in the preceding paragraphs of his Complaint as if fully restated herein.

98. Mrs. Poeppelmeyer was regularly subjected to unwanted harassment and hostile treatment at the hands of VITAS management. She was singled out in group meetings and embarrassed by VITAS management on a regular basis.

99. Mrs. Poeppelmeyer was treated differently than other VITAS employees with respect to VITAS's actions being canceled, delayed, or left unpaid if the matter was relating to one of Mrs. Poeppelmeyer's client.

100. VITAS management created a hostile work environment by intentional targeting Mrs. Poeppelmeyer's clients in an attempt to force Mrs. Poeppelmeyer to resign. Alternatively, VITAS's intentional targeting could have been an attempt by management to create a negative record of poor work performance such that VITAS could terminate Mrs. Poeppelmeyer for cause.

101. The individual responsible for the majority of the unwanted harassment, Ms. Fleming, was a salaried managerial employee of VITAS, over whom VITAS has *respondeat superior* liability.

102. VITAS knew of Ms. Fleming's harassing and discriminatory behaviors towards Mrs. Poeppelmeyer, yet did nothing to cease the activities.

103. VITAS knew of Ms. Fleming's harassing and discriminatory behaviors towards Mrs. Poeppelmeyer, yet Ms. Fleming was not given any disciplinary write-ups of any kind.

104. As a result of VITAS's employees' regular harassment, different treatment, and intentional targeting, Mrs. Poeppelmeyer's work performance was negatively impacted.

105. As a further result of VITAS's employees' regular harassment, Mrs. Poeppelmeyer was forced to endure an intimidating, hostile, and offensive work environment.

106. As a direct and proximate result of VITAS' conduct, Mrs. Poeppelmeyer has suffered and will continue to suffer economic and non-economic damages, including but not limited to pain and suffering and the loss of salary, benefits and other terms, privileges and conditions of employment for which VITAS is liable.

107. VITAS' conduct was willful, wanton, reckless and/or malicious for which VITAS is liable for compensatory damages, punitive damages and reasonable attorney's fees and costs.

**SIXTH CAUSE OF ACTION**

**(Constructive discharge)**

108. Mrs. Poeppelmeyer realleges each of the allegations contained in the preceding paragraphs of his Complaint as if fully restated herein.

109. Mrs. Poeppelmeyer was regularly subjected to unwanted harassment and hostile treatment at the hands of VITAS management, as described above.

110. The constant harassment, different treatment, and intentional targeting from VITAS's employees, resulted in an intolerable and unbearable working environment for Mrs. Poeppelmeyer.

111. The constant harassment, different treatment, and intentional targeting from VITAS's employees unreasonably altered the terms and conditions of Mrs. Poeppelmeyer's employment.

112. As a result of VITAS's employees' actions, Mrs. Poeppelmeyer's work environment was so unbearable and intolerable, Mrs. Poeppelmeyer felt compelled to resign.

113. Mrs. Poeppelmeyer attempted to tender her resignation to VITAS on July 23, 2012.

114. For reasons unknown, VITAS refused to accept Mrs. Poeppelmeyer's resignation.

115. Instead, VITAS terminated Mrs. Poeppelmeyer on July 26, 2013.

116. As a direct and proximate result of VITAS' conduct, Mrs. Poeppelmeyer has suffered and will continue to suffer economic and non-economic damages, including but not limited to pain and suffering and the loss of salary, benefits and other terms, privileges and conditions of employment for which VITAS is liable.

117. VITAS' conduct was willful, wanton, reckless and/or malicious for which VITAS is liable for compensatory damages, punitive damages and reasonable attorney's fees and costs.

**SEVENTH CAUSE OF ACTION**

**(Tortious interference with a business relationship - Fleming)**

118. Mrs. Poeppelmeyer realleges each of the allegations contained in the preceding paragraphs of his Complaint as if fully restated herein.

119. A business relationship existed between VITAS and Mrs. Poeppelmeyer, namely an employer/employee relationship.

120. Ms. Fleming had knowledge of the business relationship between VITAS and Mrs. Poeppelmeyer.

121. Ms. Fleming took numerous actions which sabotaged the employment relationship between VITAS and Mrs. Poeppelmeyer by targeting Mrs. Poeppelmeyer's business contacts and impeding her ability to properly perform the functions of her job.

122. As a direct and proximate result of Ms. Fleming's conduct, Mrs. Poeppelmeyer has suffered and will continue to suffer economic and non-economic damages, including but not limited to pain and suffering and the loss of salary, benefits and other terms, privileges and conditions of employment for which VITAS is liable.

## EIGHTH CAUSE OF ACTION

**(Tortious interference with a business relationship - VITAS)**

123. Mrs. Poeppelmeyer realleges each of the allegations contained in the preceding paragraphs of his Complaint as if fully restated herein.

124. A business relationship existed between Mrs. Poeppelmeyer and various potential clients she was pursuing as VITAS clients. Mrs. Poeppelmeyer had worked in this industry for years and a lot of these potential clients for VITAS were individuals she had previously worked with in the healthcare field.

125. For those new potential clients, Mrs. Poeppelmeyer was in the process of developing a business relationship with these individuals. These new potential clients represent a prospective business relationship with Mrs. Poeppelmeyer.

126. VITAS had knowledge of the business relationship between Mrs. Poeppelmeyer and her existing clients.

127. VITAS had knowledge of the business relationship between Mrs. Poeppelmeyer and her potential clients.

128. Ms. Fleming took numerous actions which sabotaged the employment relationship between VITAS and Mrs. Poeppelmeyer by targeting Mrs. Poeppelmeyer's business contacts and impeding her ability to properly perform the functions of her job.

129. The individual responsible for the majority of the client targeting, Ms. Fleming, was a salaried managerial employee of VITAS, over whom VITAS has *respondeat superior* liability.

130. VITAS knew of Ms. Fleming's targeting, hostility, and discriminatory behaviors towards Mrs. Poeppelmeyer, yet did nothing to cease the activities.

131. VITAS knew of Ms. Fleming's harassing and discriminatory behaviors towards Mrs. Poeppelmeyer, yet Ms. Fleming was not given any disciplinary write-ups of any kind.

132. VITAS knowingly allowed, and thus implicitly condoned, Ms. Fleming's continued interference in Mrs. Poeppelmeyer's business relationships with existing and potential clients.

133. As a result of VITAS's refusal to stop Ms. Fleming's interference, Mrs. Poeppelmeyer's work performance was negatively impacted.

134. As a direct and proximate result of VITAS's inactivity, Mrs. Poeppelmeyer has suffered and will continue to suffer economic and non-economic damages, including but not limited to pain and suffering and the loss of salary, benefits and other terms, privileges and conditions of employment for which VITAS is liable.

WHEREFORE, Mrs. Poeppelmeyer demands judgment against VITAS and Ms. Fleming in an amount of not less than Twenty-Five Thousand Dollars ($25,000.00), together with interest, compensatory damages, punitive damages, court costs, attorneys' fees and such other relief as may be just and proper.

Respectfully submitted,

**DORMAN LAW LLC.**

/s/ *Derek J. Walden*
Derek J. Walden (OH – 0083730)
Of Counsel, Dorman Law LLC
1820 Northwest Blvd., Suite 100
Columbus, OH 43212
Phone: 614-827-1200
Fax: 866-827-0234
Email: derek@dormanlegal.com
*Attorney for Plaintiff Marian Poeppelmeyer*

**JURY DEMAND**

Plaintiff hereby demands a jury trial by the maximum persons permitted by law on all issues herein triable to a jury.

/s/ *Derek J. Walden*
Derek J. Walden (OH – 0083730)